UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO: 3:20CR12 (VAB) |
| | : | |
| v. | : | |
| | : | |
| STEPHFAN SANDERSON | : | Date:   March 17, 2023 |

GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

"It's time to take back the community and pay attention to what is going on. . . . it's up to the young people who are often the victims and perpetrators of gun violence to make the choice to value their lives and the lives of others."

These are the words Carolyn Vermon told a reporter at a vigil friends and family members of the 24 murder victims in Bridgeport in 2020 held at McLevy Green in Bridgeport on January 21, 2021.  [Family, friends remember the 24 victims of gun violence killed in Bridgeport last year (news12.com)](#).  In the years preceding that memorial, the Greene Homes Boyz Gang and its allied O.N.E. gang were involved in a murderous street gang confrontation with their rivals, the East End Gang, the PT Barnum Gang and the 150 Gang, which was fueled by the influx of illegal guns into Bridgeport, Connecticut.  Stephfan Sanderson certainly did not value the "lives of others" in Bridgeport. Rather, from the relative safety of his perch in Convington, Georgia, Sanderson trafficked between 25 and 99 firearms, including switches that converted the guns to fully automatic, to the Greene Homes Boyz and O.N.E. knowing full well what they were doing with his guns.  In feeding the feud with a steady flow of guns he acquired in Georgia and transported to Bridgeport, Sanderson not only achieved significant profit for himself, but also was one of the "young people" who contributed to Bridgeport's 2020 spike in gang-related, a spike which notably has retreated since his November 2020 arrest.

1

The Government respectfully submits this memorandum in aid of sentencing for the sentencing of Sanderson (hereinafter "Sanderson" or "the defendant"), which is currently scheduled for March 22, 2023 at 1:00 p.m.  In light of the seriousness of his actions, the sentences imposed on those who Sanderson supplied, including co-defendant Undrea Kirkland who received a sentence of 210 months,[1] the need for deterrence to other gun traffickers who turn Connecticut's cities into war zones, and the need to protect the public, the Government respectfully recommends a sentence of ten years of imprisonment.

## Background

I.  Factual background

The offense conduct is described in considerable detail in paragraphs 8-34 of the final Presentence Report ("PSR"). The Government will not repeat that full description herein, but will discuss aspects of it below.

II.  Procedural history.

On November 12, 2020, Sanderson was arrested in Georgia,[2] and was ordered detained. On November 25, 2022, Sanderson entered a guilty plea to a single-count Substitute Information, charging him with Crossing State Lines with the Intent to Engage in the Unlicensed Dealing of Firearms, in violation of Title 18, United States Code, Sections 922(a)(1)(A) and 924(n) before this Court.

On his plea of guilty to that count, Sanderson faces a maximum penalty of ten years of

---

[1] *See* 3:20CR126(JBA)
[2] ATF agents attempted to arrest Sanderson at his home in Covington, Georgia, but Sanderson mocked the arrest attempt by sending Greene Homes Boyz member Fabian Francis a still from his Ring doorbell camera showing an ATF Special Agent outside his front door.  *See* PSR ¶ 29.

2

imprisonment, and a $250,000 fine. Moreover, any sentence of incarceration under this provision must also include a term of supervised release of up to three years to follow any term of imprisonment. Pursuant to the plea agreement, Sanderson has waived his right to appeal any sentence that does not exceed 120 months of imprisonment, a three-year term of supervised release, a $100 special assessment, a $250,000 fine, and forfeiture of any interest he has remaining in the firearms he procured in Georgia and Alabama and transported to Connecticut for sale.

III. The Presentence Report

On February 23, 2023, the Probation Office filed a Pre-Sentence Report (hereinafter "PSR"). The well-researched and thorough Pre-Sentence Report determined that the defendant had a base offense level of 20, pursuant to U.S.S.G. § 2K2.1(a)(4)(B) because his crime involved a machine gun. PSR ¶ 41. That base offense level was increased by six because the offense involved at least 25 but less than 99 firearms, pursuant to U.S.S.G. § 2K2.1(b)(1)(C). PSR ¶ 42. A further four levels were added pursuant to U.S.S.G. § 2K2.1(b)(5) because the defendant engaged in the trafficking of firearms. PSR ¶ 43. An additional four levels were added pursuant to U.S.S.G. § 2K2.1(b)(6)(B) because the defendant transferred firearms with knowledge, intent, and reason to believe that those firearms would be used or possessed in connection with another felony offense. PSR ¶ 44. Subtracting three levels due to the defendant's acceptance of responsibility, the PSR accorded Sanderson a total offense level of 29. PSR ¶¶ 50-52.

The PSR also determined that Sanderson had accrued 3 total criminal history points, which placed him within Criminal History Category of II. PSR ¶ 61. Based on a Criminal History Category II and a total offense level of 29, the PSR calculated that Sanderson's advisory guidelines range is 97 to 121 months in prison, which due to the maximum penalty of the crime charged

3

results in an advisory guidelines range of 97 to 120 months of imprisonment.   PSR ¶ 106.[3]

Argument

I.    A Sentence of Ten Years of Imprisonment is Reasonable in light of the Sentencing Factors.

    A.    Consideration of whether to impose a Guideline sentence

A sentencing court must fashion a sentence that is both procedurally and substantively reasonable by properly calculating the base offense level under the United States Sentencing Guidelines and adequately explaining its reasoning for handing down a particular sentence. *Gall v. United States*, 128 S. Ct. 586, 594 (2007) ("It is also clear that a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications"). Where, as here, a defendant seeks a diversion from the PSR (as does the Government), the court may hold an evidentiary hearing to rule on the dispute in order to ascertain the appropriate criminal history category and fashion a procedurally reasonable sentence. Fed. Crim. R. Proc. 32(i)(3)(B). At such a hearing, the sentencing court may factor in any information that sheds light on the defendant's history, background, behavior or characteristics. *Williams v. New York*, 337 U.S. 241, 249-50 (1949).

It is well-established that the right to confront witnesses does not apply at a sentencing hearing; nor do rules prohibiting the admission of hearsay. *See, e.g., United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005)(Sotomayor, J.)(listing cases).   Indeed, "[a]ny information

---

[3] The Government was unaware of Sanderson's 2017 Georgia conviction for Willful Obstruction of Law Enforcement Officers and his status on probation.   Accordingly, the plea agreement scores Sanderson as having a Criminal History Category I, which yielded an advisory range of 87 to 108 months' imprisonment.

4

may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy." *United States v. Simmons*, 164 F.3d 76, 79 (2d Cir. 1998). Thus, at a sentencing hearing, the Government may present testimony through law enforcement witnesses regarding the substance of victims' statements, *see United States v. Perez*, 523 Fed. App'x. 842, 844 (2d Cir. 2013); witness interviews, *United States v. Martinez*, 413 F.3d at 241-42, evidence seized in violation of the Fourth Amendment, *see United States v. Tejeda*, 956 F.2d 1256, 1263 (2d Cir. 1992), "statements obtained in violation of *Miranda*, if otherwise voluntary," *see United States v.Nichols*, 438 F.3d 437, 442 (4th Cir. 2005), and corroborated information from an unidentified source as long as the Government shows good cause for its refusal to reveal the source, *see United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989). Further, a sentencing court may rely on the Government's proffer, *United States v. Lee*, 818 F.2d 1052, 1057 (2d Cir. 1987), and evidence from a hearing in which the defendant was neither present nor represented. *Carmona*, 873 F.2d at 574.

    B. <u>Use of Uncharged Conduct</u>

A district court may consider unrelated criminal conduct in sentencing if it can be proven by a preponderance of the evidence. *See Alleyne v. United States*, 133 S. Ct. 2151, 2163, 186 L.Ed.2d 314 (2013) ("We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment."); *United States v. Broxmeyer*, 699 F.3d 265, 294 (2d Cir.2012)("We here reiterate only that a district court enjoys considerably more discretion in the evidence it may consider when making a final sentencing decision under 18 U.S.C. § 3553(a), *see id.* § 3661, than it does when applying a particular guideline. That discretion entitled it to consider not only the sodomy of K.M., but the full range of Broxmeyer's sexual exploitation

5

of teenagers in his care, and to accord this information considerable aggravating weight in assessing the seriousness of the crimes of conviction, the defendant's history and character, and the need for deterrence")(citation omitted).

    C.    <u>The Section 3553(a) Factors</u>

        1. The Nature and Circumstances of the Offense

Stephfan Sanderson committed an extremely serious crime that has had a lasting deleterious impact on Connecticut, and Bridgeport in particular. As noted in the PSR, one of the guns he trafficked from Georgia to Connecticut, "a Glock 17, serial number GT149US, recovered in May 2022 has been linked to two separate shootings and one homicide, all having occurred in Bridgeport, Connecticut." PSR ¶ 34. The mother of that homicide victim is not considered a victim of Sanderson's, but Sanderson's trafficking of the gun is certainly a proximate cause of her son's death. While Sanderson faces a maximum sentence of ten years of imprisonment and no doubt has family who wish to see him soon, that mother will never see her son again.

The victims of the firearms Sanderson supplied to the Greene Homes Boyz Gang ranged beyond the Greene Homes Boyz intended rivals. The Glock equipped with a switch that converted it into a fully automatic machine gun that Sanderson supplied co-defendant and GHB member Kirkland was used by Kirkland on October 4, 2018 to fire 32 .9 millimeter bullets at Malyk Shipman and Tyrone Heard, both rival East End Gang members. Although Kirkland's machine gun fire missed Heard and provided Shipman with minor injuries, Jose Gutierrez, whose "crime" was being in the kitchen of his two-floor residence across from the Greene Homes Housing Complex, putting away food his wife had prepared at the time of the shooting, heard the shots and ducked behind the refrigerator. While ducking, he was struck by a bullet, which had

6

passed through the wall of his residence, through the refrigerator, before hitting him in the back. Mrs. Gutierrez, his wife, and their 8-year-old son were also in the home at the time of the shooting. Mrs. Gutierrez, who testified at one of the sentencings of GHB members, informed Judge Arterton that she had been traumatized and receives therapy for the anxiety she suffers to the day she testified. Mrs. Gutierrez, who was on the second floor of the residence at the time of the shooting, recalled picking up approximately 28 or 29 projectiles from her residence. Two vehicles belonging to the victims, and furniture *in the house* were damaged during the shooting.

Nor can Sanderson claim that he did not know the guns he supplied would be used in a violent and bloody gang war in Bridgeport. In a 2019 Facebook conversation with GHB members Chaz Dear[4] and Asante Gaines,[5] Sanderson recognized that GHB's conduct would lead to federal racketeering charges, but that although he was a member, he would not be charged with racketeering because Sanderson actively avoided posting pictures of himself with members of GHB, like Dear and Gaines:

> DEAR: "rs talking about it's gon be beef shut up" … "you all tryna be in ya feelings"
>
> SANDERSON: "I'm from KAHLANDAVE where we spank murders, attempts, &'d robberies!! The opps goofey as hell tryna be like US" … "I smell indictments coming real soon."
>
> GAINES: "Stfu" ("Shut the fuck up.")
>
> SANDERSON: "Fed bound" .. "Lil boy" … "Racketeering in one status lol."

---

[4] The Honorable Vanessa L. Bryant sentenced Dear, a GHB member, to 78 months on his guilty plea to being a felon in possession of a firearm, notably a Glock from Alabama. *See* 3:20CR57(VLB).

[5] The Honorable Janet Bond Arterton sentenced Gaines, a GHB member, to 190 months of imprisonment on his guilty plea to racketeering conspiracy. See 3:20CR126 (JBA).

> GAINES: "You going down to"
>
> SANDERSON: "I barely got pics wit niggaz I'm good."

Sanderson's reference in the group conversation with GHB members to KAH-LAND-AVE is a reference to the Greene Homes Housing Complex, which is on Highland Avenue in Bridgeport. Kahlil Diaz, a.k.a. "Kah," was killed by a rival 150 gang member shortly after he was acquitted of murdering a 150 gang member. After Diaz was murdered, GHB members mourned him by practically deifying him and using his name as a basis for oath. Sanderson writes that he and his fellow GHB members commit murders, attempted murders and robberies and notes that the opposition ("opps") wants to be just like GHB. When Sanderson suggests that Gaines will be charged with racketeering, Gaines does not deny it but merely notes that Sanderson will be arrested as well ("You going down to [*sic*]"). Sanderson explains that he will never be charged because he is too smart to be in photographs with his fellow GHB members ("I barely got pics wit niggaz").

Additionally, as noted in PSR paragraph 26, in an August 18, 2019 Facebook conversation with GHB member Laheem Jones, who received 190 months' imprisonment for his role in GHB,[6] Sanderson said, "Nigga I'm the reason yaull even go wops." When Jones replied "You never shot nobody," Sanderson replied, "Worda kah (a deceased and deified GHB member) I pop someone." Jones then responded, "You never. Pop nobody you move outta bpt because you not ready for a war," to which Sanderson responded, "😊😊😊 I'm th reason yaull war ready goofy." In short, Sanderson claimed credit for the GHB gang's success in killing and injuring their rivals with no regard for GHB's victims, whether rivals or not.

---

[6] Jones was sentenced on his guilty plea to Racketeering Conspiracy. See 3:20CR126(JBA).

Notably, as the PSR shows, Sanderson had provided guns to almost all the defendants who pleaded guilty in federal court for their participation in the GHB Racketeering Conspiracy, some of whom, like Marquis Isreal, who Judge Arterton sentenced to 210 months of imprisonment, Gaines, and Jones, admitted to their direct participation in the January 27, 2020 daylight shooting outside the Bridgeport State courthouse that resulted in Trevon Wright, an East End gang member, being paralyzed. As Undrea Kirkland candidly admitted at his change of plea hearing, his and GHB's goal was to gain control of the City. The very public vigilantism that Sanderson fueled through his steady gun supply almost allowed that goal to succeed.

2. Sanderson's History and Characteristics

The well-researched PSR details Sanderson's upbringing including his exposure to an abusive father. The PSR also outlines a family history from which Sanderson should have learned to eschew violence. Although Sanderson grew up in the Greene Homes area of Bridgeport, after his brother, a member of GHB, was sentenced to twenty years of imprisonment for first-degree manslaughter, he should have known better. As the PSR reveals, his mother moved him to a six-bedroom house in Covington, Georgia after his brother's arrest to protect him and to keep him away from harmful peers. Nonetheless, Sanderson not only maintained contact with GHB gang members and supplied them with guns, but also bragged to them about acts of violence he had committed. Even if, as Sanderson will no doubt claim, Sanderson's claim to Laheem Jones that he killed someone ("Worda kah I pop someone)" was puffery, Sanderson was proud of the fact that his guns powered GHB's violence ("😊😊😊 I'm th reason yaull war ready goofy"). In fact, it is extremely troubling that the one thing Sanderson learned from his brother's arrest and conviction, was that he should remain behind the scenes in acts of violence.

9

Sanderson's conversations with fellow GHB members also demonstrate that he was more than just a gun dealer, he encouraged the violence. On September 23, 2019, GHB members Gaines, Jones, Fabian Francis, and Sanderson discussed who should commit the next act of violence against the opposition:

GAINES: Long story short I'm a vet (veteran) you not

FRANCIS: worda kah (deceased GHB member Kahlil Diaz) ima vet nd a legend

FRANCIS: ill let the streets Vouch for me . . .

SANDERSON: I got 100 ($100) who ever catch next one first (referring to opposition member)

FRANCIS: bird (SANDERSON) u got catch da next one

FRANCIS: u nd spazz (DEAR) lol . . .

GAINES: It u Nd bird time

GAINES: I'll just drive . . .

DEAR: I had my year015

DEAR: he was when me and gmint (unknown to Law Enforcement at this time) punched on em

FRANCIS: so its bird (SANDERSON) turn 2020 bird year . . .

GAINES: Spaz (DEAR) Fyd chase Kevin (150 Gang member Kevin Beason)

SANDERSON: Who Kevin

DEAR: it's straight we gon see what 2020 hitting for?

DEAR: I did wat more than you know

DEAR: way (correcting "wat" above)

FRANCIS: spazz had 015 I had 014 , 16 &17, sant had 013 16 & 17 now bird (SANDERSON)

ya turn

In this discussion, after Gaines posted that he was a veteran of the gang war's violence and that Sanderson had not earned that status, Sanderson offered $100 to the next GHB member who killed an opposition member.  Francis and Gaines suggested that it was Sanderson's turn to kill the next opposition member, with Gaines offering to drive the car that Sanderson would use to target the opposition gang member.

Later that afternoon, the four turned to discussing the rival East End gang.  A post of Trevon Wright, a.k.a. "Tre," who had shot O.N.E. ally Marquise Isreal eight days earlier, was then put into the conversation.  Dear stated, "that lil nigga realy ugly asf."  Francis replies, "rs (real shit) he be on go to," and Gaines described Wright as "Dirty."  Gaines then provided intelligence on Wright's location: "Hiss address 646 maple st," and posted a picture of the residence, before adding, "That his mom house."  Gaines then provided intelligence to the group on East End gang member Harry Batchelor, a.k.a. "Bookie."  Gaines states, "Bookie in a silver acrua (Acura) truck," adding with "Tents."  Dear adds that Bookie's Acura truck is "tinted down" and that he has first-hand knowledge of it having seen it ("i know trav pmo").  Gaines then posted a photograph of a house, which he related was East End gang member Trevon Jones, a.k.a. "Budda," house ("Budda man house").  Trevon Jones had murdered Shawn Warren, an associate of GHB's ally, the O.N.E. gang.  *See* Superseding Indictment 3:21CR08(VAB) at ⁋12(e).

The next day, September 24, 2019, the following conversation occurred:

FRANCIS:    sant (Gaines) member (remember) da shit u had da G (Glock) 30 ? you think I should trade my shit (my firearm) for dat?

GAINES:     I added her (referring to a firearm)

GAINES: Who got that

GAINES: Tell em trade me

SANDERSON: Me

FRANCIS: my wierdo man got it nd (no doubt) im bouta grab she (the gun)

FRANCIS: bird but when can u get da dick (the firearm) for it?

GAINES: Let me do it . . . .

SANDERSON: Tomorrrow . . .

GAINES: Wop

GAINES: We been through

GAINES: A lot

FRANCIS: bird (Sanderson) grab she (the gun) da one for da 21 (Glock 21) & spazz (Dear) we just gon use da titty (50 round drum magazine) for ya shit (your gun) but spazz (Dear) ima come give u da 22 clipyy (22 round magazine) nd u give me da regular clipy (legally sized magazine) he aint getting da 22 clipy.

GAINES: You gon let me tot (carry) ya 30 (Glock 30 referenced above by Francis)

GAINES: We trade

GAINES: U can't handle

GAINES: That anyway

DEAR: Copy

SANDERSON:



In this conversation, the four GHB members planned to shoot Wright, Batchelor or Jones, whose locations they had discussed the day before. Sanderson showed that he was ready with his firearm. Although the shooting did not occur and Wright, Batchelor and Jones were subsequently indicted and incarcerated pre-trial for RICO Conspiracy, including murder, Sanderson's participation in the conversation and the photograph he sent to show he was ready to exact GHB's vigilante justice demonstrates his dangerous characteristics. Thus, despite his mother having moved him nearly 1000 miles away from Bridgeport, Connecticut, Sanderson encouraged his fellow Greene Homes Boyz Gang members to commit violence and used his location in Georgia, near the Glock manufacturing facility, to supply them with firearms.

Sanderson relies on Professor Elijah Anderson's description of persons influenced by the inner-city streets around them to assert that he is a product of the interpersonal violence and aggression that he has been forced to witness daily. See Doc. 89 at 5. But Sanderson ignores that his mother had removed him at age 15 from the community where "he witnessed violence and drugs" and the bad influence of "his brother's friends." PSR ¶ 89. Despite the separation his mother imposed, Sanderson made the affirmative choice to drive nearly one thousand miles (two thousand miles roundtrip), not once but repeatedly, to traffic firearms to the very people from

whom his mother sought to protect him.    And the case shows that Sanderson did not make these trips because of simple loyalty to "the friends with whom he endured the struggles and travails of youth."    Doc. 89 at 7.    Sanderson returned to Bridgeport for profit.    A reverse carpetbagger, he brought guns from the South to a beleaguered Northern city to make profit.    An intelligent man, as his mother acknowledges, he knew he had a receptive market in Bridgeport and that the more guns he brought to Bridgeport, the more guns would be needed in Bridgeport.    After all, once a gun was used in a shooting, it had to be disposed of or traded as it was "hot."    The arms war he created or at least sustained in Bridgeport was not a product of being friendless in Georgia, but of his desire for easy money.    In fact, Sanderson's Instagram account and easy access to straw buyers in Georgia belies the claim that he was a "fish out of water, struggling to make personal connections with a peer group that seemed foreign to him."    Doc. 89 at 7; PSR ¶ 72.[7]    Even with one thousand miles through seven states and the District of Columbia separating him from the GHB friends with whom he grew up, Sanderson offered money he had made from the sale of guns to the gang to kill or shoot the first opposition member of the year ("I got 100 who ever catch next one first").    Of course, that murder or shooting would require another gun for the shooter and Sanderson would more than make up for his bounty in the profit from the sale of the new gun. Sanderson is not a person who was forced to go along with violence for risk of being subjected to it himself.    Rather he is an enabler of violence, whose firearms caused destruction, anxiety and fear amongst countless persons, young and old, in Bridgeport.

---

[7] Nor has Sanderson avoided legal trouble in Georgia.   Despite being on probation in Georgia, conversations taken from his Instagram show that Sanderson was certainly involved in criminal activity.   As PSR paragraph 31, Sanderson was, at a minimum, worried that someone would "snitch" on him.

3. Protecting the Public and Deterrence.

Sanderson has proven himself a danger to the citizens of Bridgeport. Despite his efforts to suggest that he was a product of the Bridgeport environment who had to go along with the violence that was around him, he was a resident of Georgia since 2015, who returned to Bridgeport to poison the community and to make money. He brought between 25 and 99 guns into the area despite having been provided with an example of deterrence and being physically separated from his gang. Instead, Sanderson used his gang connections to make money from the trafficking of firearms to that gang. He knew full well for what the firearms were being used and goaded his distant peers into more violence. Where physical separation has failed to deter Sanderson, the final resort is incapacitation. The citizens of Bridgeport deserve to know that those who poison their community with illegal guns will be punished severely.

Additionally, with the huge influx of guns into Bridgeport from Southern states, *see* https://www.ctpost.com/projects/2020/death-by-gun/gun-tracking-connecticut/, principles of general deterrence strongly favor a lengthy sentence to cause those who seek to mimic Sanderson to think twice about their actions. Future gun traffickers should be able to weigh the risk of spending ten years of their lives incarcerated against the quick profit of buying guns in Georgia and selling them in Connecticut, and realize that the profit is not worth the risk. This is especially true for persons like Sanderson, who knew the exact purpose for which the guns he trafficked were being used – murders, attempted murders and robberies.

Sanderson suggests that general deterrence "should be rejected out-of-hand" because Sanderson is "a byproduct of systematic failures and policy choices that leave him, and far too many young men like him, at risk." Doc. 89, at 3. What that victimization argument ignores is

that Sanderson and his GHB brethren turned Bridgeport neighborhoods into war zones. It overlooks that Sanderson, through the guns with which he flooded Bridgeport, was the source of trauma to countless Bridgeport residents, including the very children discussed in the articles Sanderson cites (Doc. 89 at 7-9), by enabling GHB members' public murderous rampage through the streets of Bridgeport between 2017 and early 2020. It was Sanderson who provided the tools that taught younger impressionable teenagers that shooting others was a means to garner respect and that protecting one's neighborhood through positive contact with law enforcement was a basis for opprobrium. To assert that Sanderson was a victim of circumstances ignores the damage he caused – the violence Sanderson enabled shows that *he* was a corrupting influence on countless children and adults who lived in the areas he chose to shoot rivals. The citizens of Bridgeport deserve better – the enormous majority of citizens who respect the law, especially those who grew up under circumstances similar to Sanderson and who did not choose to fuel violence, need to know that they are protected and that those who cause trauma – both physical and psychological – will be removed from society for a significant period of time.

As AUSA Kaoutzanis and the undersigned discuss preventing gun violence with sixth, seventh and eighth graders in each of Bridgeport's middle schools, one stark fact stands out – each of those young minds has been traumatized by the sound of gunfire and over half know someone who has been injured or killed by gunfire. The same response is not found in the neighboring towns of Fairfield, Stratford and Trumbull. As sociologists search for reasons behind education gaps between communities, what child would not be traumatized by the sound of automatic gunfire from a gun Sanderson trafficked from Georgia outside their home? What middle schooler could perfect their STEM learning or proof-read their literature assignment while constantly glancing

16

over their shoulder at their window for fear of a high-powered bullet from a machine gun or another firearm that Sanderson sold in Bridgeport?   These are not abstract questions – Mr. Gutierrez was shot through a wall and a refrigerator by a high-powered automatic firearm that Sanderson had provided co-defendant Kirkland.   Mr. Gutierrez's eight-year-old son and his wife were nearby and remain traumatized.   To claim that Sanderson is a victim is an affront to the countless victims his firearms created.

Sanderson's argument also ignores the impact his arrest and the arrest and conviction of his fellow gang members has had on crime in Bridgeport.   According to statistics maintained by the Bridgeport Police Department, it is beyond contention that future acts of violence were avoided by the investigative efforts of the Bridgeport Police Department, the Federal Bureau of Investigation and the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the arrest and prosecution of Sanderson, GHB, ONE and East End gang members.   Thus, although there were 85 gang related gunshot victims and 13 gang related homicides in 2020 in the City of Bridgeport, in 2021, after the arrests of ONE, Greene Homes Boys and East End gang members, there were 35 gang related gunshot victims and 5 gang related homicides.   In 2022, there were 29 gang related shootings and 8 gang related homicides. In fact, in 2020, the year in which Sanderson's gun supply to Bridgeport came to an end, there were 5056 gun shots recorded on shot spotter; in 2022, there were 2998.   To assert that the significant reduction in gang-related gunshot victims has no relation to the incapacitation of the ONE, GHB and East End gang members, and their respective gun suppliers, would be incorrect. To protect the Bridgeport public from Sanderson, he needs to be incapacitated.

4. <u>Need to avoid unwanted sentencing disparity</u>

In imposing a sentence, the Court must determine a sentence that avoids unwarranted nationwide disparities. *See United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008). Nonetheless, it bears noting what other recent gun traffickers in Connecticut have received recently. On February 27, 2023, the Honorable Stefan R. Underhill, United States District Judge, sentenced Marquis Pollard of South Carolina to 96 months for trafficking at least 17 firearms from South Carolina to Connecticut. https://www.justice.gov/usao-ct/pr/south-carolina-man-who-trafficked-guns-connecticut-sentenced-8-years-federal-prison. On March 4, 2022, the Honorable Janet C. Hall sentenced Lonnie Joyner, who had trafficked guns from Maine to Waterbury that he had received in exchange for drugs to the maximum ten years' imprisonment. https://www.dea.gov/press-releases/2022/05/04/waterbury-man-involved-connecticut-maine-drug-and-gun-trafficking. The sheer volume of the firearms Sanderson brought from Georgia to Connecticut and his knowledge and encouragement of the violent use being made of the firearms demonstrate that there is no sentencing disparity if Sanderson is sentenced to ten years' imprisonment; nor is such a punishment excessive.

CONCLUSION

For the foregoing reasons, the Government respectfully requests that Sanderson receive a sentence of 120 months of imprisonment, whether as the top of the Guidelines if the Court determines that he is not entitled to a *Fernandez* departure, or as an upward variance if the Court determines that he is.

                                        Respectfully submitted,

                                        VANESSA ROBERTS AVERY
                                        UNITED STATES ATTORNEY

                                        *s/ Rahul Kale*

                                        RAHUL KALE
                                        ASSISTANT U.S. ATTORNEY
                                        Federal Bar No. phv02526
                                        1000 Lafayette Blvd., 10th Floor
                                        Bridgeport, CT 06604
                                        Tel.: (203) 696-3000

## C E R T I F I C A T I O N

      This is to certify that on March 17, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

      *s/ Rahul Kale*

      RAHUL KALE
      ASSISTANT U.S. ATTORNEY